IDY DANZ, Plaintiff and Appellant, *v.* MATÍAS SUAU BALLES-
TER, ETC., ET AL., Defendants and Respondents.

No. 11832. Submitted March 26, 1959.—Decided May 15, 1961.

*Enrique Báez García* and *Héctor Reichard* for appellant. *García Méndez & García Hermida* for respondents.

MR. JUSTICE BELAVAL delivered the opinion of the Court.

In this action, plaintiff Idy Danz requests Matías Suau Ballester, represented by his tutor Juan Bautista Echeverría; Bernardo, Manuel, Bartolo, María, Carolina, Julia, Margarita, Amalia, Federico, and Santiago Suau Soler, in representation of Bernardo Suau Ballester; María Suau Ballester; María, Bárbara, and Margarita Suau Alcover, in representation of Mariano Suau Ballester; Miguel Suau Ballester, and Jaime Suau Ballester, as heirs of Pedro Suau Ballester, the division of a certain community of property existing between her and Pedro Suau Ballester. Pedro Suau Ballester's brothers were Matías Suau Ballester, Bernardo Suau Ballester, Mariano Suau Ballester, Miguel Suau Ballester, and Jaime Suau Ballester, and his sister was María Suau Ballester. Two of his brothers, Bernardo and Mariano, died before Pedro Suau Ballester, and their aforementioned children appear in their behalf.

Codefendant Matías Suau Ballester, represented by his tutor Juan Bautista Echevarría; codefendants Bernardo, Manuel, Bartolo, María, Carolina, Julia, Margarita, Amalia, Federico, and Santiago Suau Soler (children of Bernardo Suau Ballester); codefendant Bernardo Suau Soler, acting as attorney-in-fact of María Suau Ballester and María Suau

Alcover, answered the complaint opposing plaintiff's claim. Codefendant Miguel Suau Ballester, and codefendants Bárbara Suau Alcover and Margarita Suau Alcover, (daughters of Mariano Suau Ballester) answered the complaint consenting to plaintiff's claim. Jaime Suau Ballester did not answer the complaint and his default was entered before trial.

As may be noted, the situation regarding the parties is as follows: Matías Suau Ballester; the children of Bernardo Suau Ballester, surnamed Suau Soler; María Suau Ballester, and a daughter of Mariano Suau Ballester, María Suau Alcover, oppose the complaint; Miguel Suau Ballester, two daughters of Mariano Suau Ballester, Bárbara and Margarita Suau Alcover, consent to the complaint; and Jaime Suau Ballester, whose default was entered, is neither in favor of nor against the complaint.

The facts, stipulated in part, accepted in part and proved in part without testimony to the contrary, since the opposing defendants relied on a simple question of law, are the following: Plaintiff Idy Danz divorced her former husband on November 15, 1923 (tr. 78) and six months after the divorce (tr. 82) she started to live in concubinage with Pedro Suau Ballester (tr. 82), a brother and uncle, respectively, of the defendant heirs. Pedro Suau Ballester was single (tr. 84) when he began to live in concubinage. The concubinage between Pedro Ballester Suau and Idy Danz is accepted by the opposing codefendants, although the latter alleged that it began in 1928 and not in 1924. The uncontradicted evidence of the plaintiff showed that the concubinage began in June, 1924.

Plaintiff and the predecessor of defendant heirs lived together, as concubines, from June, 1924 until June 1, 1939, at which latter date they married, and continued to live together as husband and wife, until the death of Pedro Suau Ballester on December 25, 1949. This is then a concubinage

which lasts from June, 1924 until June, 1939, followed by a marriage lasting from June 1, 1939 until December 25, 1949.

When plaintiff tried to prove the economic agreement existing between her and Pedro Antonio Suau, to divide the property and profits acquired during the first period of concubinage, the opposing codefendants objected to any statement or evidence with reference to transactions or relations had with the deceased, and the trial court denied the complaint in all its parts on said ground.

The law applicable to this case is § 3 of the Act of March 10, 1904 "to define who are competent witnesses" etc.—32 L.P.R.A. 190 § 1738—which provides: "In actions by or against executors, administrators or guardians, in which judgment may be rendered for or against them as such, neither party shall be allowed to testify against the other as to any transaction with, or statement by, the testator, intestate or ward, unless called to testify thereto by the opposite party; and the provisions of this section shall extend to and include all actions by or against the heirs or legal representatives of a decedent arising out of any transaction with such decedent."

What first strikes us most is that in this case the trial court dismissed the complaint against Miguel Suau Ballester and Mariano Suau Ballester's two daughters, Bárbara and Margarita Suau Alcover, who had consented to judgment in favor of plaintiff and against Jaime Suau Ballester, whose default had been entered. It seems that the trial court reached the conclusion that since the question of law raised by some of the codefendants had prevailed, all the others were bound by said decision.

The rule that any judgment rendered in favor of one or more participants benefits all other participants in a community of property, and that on the contrary, any adverse judgment only prejudices the one who filed the judicial action

—*Flores* v. *Rodríguez*, 77 P.R.R. 682, 685, 686 (Belaval, Snyder, Negrón Fernández) (1954)—parts from the premise that there does not exist an affirmative action to the contrary on the part of the other co-owners, for each one of them has the absolute right to dispose of his corresponding rights within the community of property. As Castán properly states, the rights related to the individual share or portion in the common interest "may be characterized by the autonomy of each participant. Each one of the co-owners—says § 399 of the Code (333 of the Civil Code of Puerto Rico)—shall have the absolute ownership of his part and that of the fruits and profits belonging thereto, and he may, therefore, sell, assign or mortgage the same and *even substitute another person in the enjoyment thereof*"—2 Castán, *Derecho Civil Español y Foral* 348 (Ninth edition of Editorial Reus 1957).

The "succession" has no existence as a juridical person in our statues—*Arvelo et al.* v. *Banco Ter. y Agr.*, 25 P.R.R. 677, 686 (Hernández, Chief Justice) (1917); *Vega* v. *García*, 61 P.R.R. 95, 96–97 (Del Toro) (1942); *Heirs of Belaval* v. *Acosta*, 64 P.R.R. 104, 106 *in fine* and 107 (Travieso) (1944); *Godreau* v. *Godreau & Co.*, 64 P.R.R. 310, 317 (Travieso) (1944); *Fuentes* v. *District Court*, 73 P.R.R. 893, 921 (Ortiz) (1952). Since the "succession" is not an entity distinct and separate from the persons composing the same, each one of the defendants in this case may adopt a different attitude regarding the complaint, and his rights should be judged separately.

This individual separability of the interest in the community of property is sanctioned in our case law. *González* v. *Heirs of Díaz*, 69 P.R.R. 598, 607, 608 (Todd, Jr.) (1949). Thus, the section of our Civil Code which should be applied is not the general § 326, but the special § 333, which provides: "Each one of the part-owners shall have the absolute ownership of his part and that of the fruits and profits belonging thereto, and he may, therefore, sell, assign or mortgage the

same, and even substitute another person in the enjoyment thereof, or lease such part, unless personal rights are involved. But the effect of the alienation or mortgage in relation to the part-owners shall be limited to the share which may be allotted to them in the division upon the termination of the common ownership, and the effect of the lease shall be to confer on the lessee during the term of the contract, the powers of the part-owner in regard to the administration and better enjoyment of the common property."

In *McCormick* v. *McCormick*, 64 P.R.R. 283 (Todd, Jr.) (1944), which seems to have caused certain confusion in this sense, involves a different situation. The issue therein was the annulment of a partition, in which action for partition the court had acquired jurisdiction over some of the heirs who were personally summoned, and had not acquired jurisdiction over other heirs summoned by the publication of edicts. Defendants summoned by edicts obtained the nullity of the partition on the ground that they had not been duly summoned. (P. 284.) Then the heirs who were summoned personally appealed to the court alleging that in view of the fact that the judgment was void as to four of the defendants who were unduly summoned, the judgment of partition could not subsist as to the other defendants, "because of the very nature of the partition." It is well-known that the phenomenon produced by the partition is to destroy the universality of property and rights which is transmitted indeterminatedly to all heirs and the individualizing of the estate. The ruling in the case was that "the judgment of nullity of the partition purported to restore the property of the estate to its original state of indivision" (p. 288) and this being a case of an indivisible judgment, the partial reversal thereof affects all the participants (p. 289 *in fine*).

But in the case at bar the situation is different since the interest involved has been declared by our own law autonomous and divisible; besides, this case does not even involve

a division of inheritance but the liquidation of a concubinage partnership followed by a conjugal partnership. It is well-known that the conjugal partnership is governed by the rules of the partnership contract—§ 1298—in everything that is not provided by the typical provisions governing it, contrary to the division of the community of property which is governed by the rules relating to inheritances—§ 340. The fact that the action is entitled "division of community" does not alter the juridical problem regarding the property acquired during the period of concubinage, and authorizes the separability of the rights corresponding to the liquidation which is always a step prior to the partition of the estate of the deceased. As a matter of reality, this action is entitled "division of community" in order to conform the same to a certain acception, rather unfortunate, in our jurisprudence regarding the partnerships de facto which concubinage creates.

 As to the partition of Jaime Suau Ballester, it seems that the trial court assumed that because § 3 of the Act of March 10, 1904, constituted an absolute defense, an implied waiver to the prohibition of plaintiff to testify as to the agreement or settlement with the deceased could not be inferred from his nonappearance. Since the case of *Cestero* v. *Heirs of Cestero*, 35 P.R.R. 908, 910 (Wolf) (1926), this Court has held that: "The appellants are mistaken in supposing that the incompetency of a witness under section 3 of the Act of 1904 is an absolute one. The statute itself shows that it may readily be waived if the witness is called by the opposite side." Thereafter it was decided that the prohibition referred exclusively to the *parties* and not to the *private persons* who knew about the agreement or settlement made with the decedent—*Lezcano* v. *Heirs of Sifonte*, 42 P.R.R. 387, 389 (Texidor) (1931). It is unquestionable that the failure of Jaime Suau Ballester to appear in court is tantamount to a waiver of whatever incompetency plain-

tiff may have had to testify as to the agreement or settlement with the decedent, and the trial court should have allowed plaintiff's testimony for the purpose of establishing an economic agreement between plaintiff and the decedent during their first period of concubinage.

Now then, regarding the other heirs who opposed the complaint, the situation is different. Although according to the case of *Pereles* v. *Martinó*, 73 P.R.R. 793, 797–800 (Pérez Pimentel) (1952), plaintiff could not prove that an economic agreement existed between her and the deceased during concubinage by means of the decedent's verbal manifestations because it was evidence which could only be contradicted by the other party whose lips were forever sealed, and because the interested parties had not waived said prohibition, this does not mean that said agreement may not be proved by other means provided by our own jurisprudence.

In *Torres* v. *Roldán*, 67 P.R.R. 342, 343–344 (Snyder) (1947), the following doctrine was established: "However, if a man and woman living in concubinage agree, expressly or impliedly, that they will pool their earnings and share equally the ownership of property purchased therewith, the courts will require the party retaining more than his share as provided in the agreement to disgorge the same. (Citations.)

"Moreover, even in the absence of such an express or implied agreement, in order to avoid unjust enrichment of the defendant, the plaintiff is entitled to share in the property jointly accumulated, in the proportion that her funds contributed toward its acquisition."

As it may be seen, aside from the express agreement proved by the very statements of the decedent—*Pereles* v. *Martinó, supra*—plaintiff has a right to prove said agreement or her right to a particular share in the property, in any of the following ways: (1) as an express agreement if

it can be proved through the testimony of private persons alien to the concubinary relationship, *Lezcano* v. *Heirs of Sifonte, supra;* (2) as an implied agreement spontaneously arising from the human and economic relationship between the parties during concubinage, *Torres* v. *Roldán, supra;* (3) as an act of justice to prevent the unjust enrichment, recognizing the value of the property, assets or services contributed by the plaintiff and their corresponding profits.

In the case at bar plaintiff alleged that while the concubinage lasted, she had a fixed salary, received alimony from her former husband, was favored by her father's inheritance and mortgage transactions with certain property belonging to her, all of which probably came to form part of the concubinary estate and possibly in an indeterminate manner, became part of the subsequent conjugal estate. It seems that the trial court was not willing to receive said evidence, or to give it its corresponding probative value, because it considered that the same was related to the agreement on division of property. To declare that this can not be proved by virtue of the absence of an agreement regarding the mode or manner of adjudicating the property, because of the prohibition contained in § 3, would be to sanction an injustice and no matter how this legal state is produced, our duty is to adjust law to justice, especially after having established the principle that "in the absence of such an express or implied agreement, in order to avoid unjust enrichment of the defendant, the plaintiff is entitled to share in the property jointly accumulated, in the proportion that her funds contributed toward its acquisition," *Torres* v. *Roldán, supra.* Nothing stated previously should be interpreted as applicable to the division of conjugal property, properly speaking, which should be decided separately as provided by law.

Neither in *Torres* v. *Roldán,* nor in *Pereles* v. *Martinó,* nor in this case, has the convenience of studying marital unions de facto, and its possible relationship to the universal

partnership of profits and losses, community of property, implied order, etc., been formally raised as a juridical question after having examined the evidence of the case, especially regarding a *more-uxiore* concubinage "characterized by the union of a man and a woman who cohabit asidually and permanently as married persons." Puig Peña *"Las Uniones Maritales de Hecho"*—393 *Revista de Derecho Privado* 1086–1103, issue corresponding to December, 1949; see, also, Luis Loreto—*"Comunidad de Bienes entre Concubinos"* 374–375 *Revista de Derecho y Legislación* 181–192, issue corresponding to July-August 1942, and 2 Planiol-Ripert, *Tratado Práctico de Derecho Civil Francés* 63–65 (*Edición de la Cultural S. A. de la Habana de 1939*). This is not the appropriate moment to examine the different theories and the juridical figures which would come into play in this study deserving a serene judgment and exhaustive study. But we do think that in the progressive enlargement of the concepts previously restricted by the archetypal conception of family law, the problem should begin to concern us.

The judgment appealed from shall be reversed and the case remanded to the trial court for the corresponding action not incompatible with the principles stated herein.